Hudson County Court of Common Pleas.

ELEANOR MOLESKI, PETITIONER-APPELLANT, v. MORRIS BOHEN AND HERBERT PRESTUP, TRADING AS WILLIAM ZALKIN, RESPONDENTS-APPELLEES.

Decided May 12, 1948.

For the petitioner-appellant, *Archie Elkins.*

For the respondents-appellees, *Harkavy & Lieb.*

Drewen, C. P. J. Petitioner claims an award for the death of her husband. He was 37 years of age and had been in respondent's employ for approximately ten years, minus time spent in the military service. His work was that of driving respondents' delivery truck, loading and delivering large quantities of various building materials. That decedent's death occurred in the course of his employment is admitted. The issue turns on whether it resulted from an accident arising out of the employment.

He died on May 29th, 1947, at about 6:30 P. M., his working day having begun at 7:50 A. M. He had just left his truck in front of a customer's dwelling and ascended the porch steps to inquire of the householder about a place for the deposit of the goods to be delivered. He had rung the bell and while awaiting the response dropped dead on the porch.

We do not see how it could be fairly doubted that the man had had a hard, laborious day; an unusually hard day according to the testimony of witnesses on both sides, testimony that remains unchallenged. To begin with, the heat was extraordinarily oppressive. The official records in evidence show that at 8 A. M. it was 76, at 12 M. it was 83, at 1 P. M. 85 and that between 4 and 6 P. M. it slowly receded from 85 to 78. Apart from this abstract record, the degree of human reaction to the weather is shown by the testimony of decedent's foreman, who describes the day as "very, very hot." Respondents' witness Rudat says: "It was almost a record temperature," and witnesses on both sides describe decedent while at work as sweating "quite a bit."

The day's succession of tasks, culminating in the final collapse, is shown as follows: Beginning at 7:50 A. M. decedent helped to load a truck with bags of cement weighing about 94 pounds each. At 8:30 A. M. he left respondents' yard with a load of cement in bags intended for four or five deliveries, these requiring the carrying of cement from the trucks to the delivery premises. At 10 A. M. he returned to the yard and he, with another, transferred 80 bags of material weighing about 100 pounds each from one truck to another, which was later driven by decedent for the delivery of the load. After making the delivery he drove to the yard of a concern referred to as Tompkins Brothers and helped in the loading on his truck, by hand, of a "couple of hundred bricks." He returned to the yard at about 12:30 and spent the next forty minutes or so at lunch. At approximately one o'clock he left the yard with a load for delivery consisting of ten bundles of sheet rock weighing about 95 pounds each, 30 joists and several bags of plaster weighing about 100 pounds each. At 3 P. M. while on the road with this material one of the truck tires went flat and he laid up for about two

hours waiting for the mechanic and necessary equipment. During this interval decedent and his helper "waited in the shade," except that decedent aided the mechanic in removing the disabled wheel and putting the new one in place. Each of these operations required the lifting of the wheel, weighing about 80 or 90 pounds, from the ground, a distance of about one inch. After the making of this repair decedent returned to the yard at about 4 P. M. He immediately drove out another truck laden with approximately five tons of material, to be disposed of in five deliveries. It was while waiting on the porch, as already shown, in anticipation of the fifth delivery that decedent died.

The four deliveries already made required numerous trips from the truck to a garage or cellar or other place of deposit, all at various distances from the truck, and frequently with objects weighing singly or in the aggregate almost 100 pounds per trip. Some of the carrying and pulling decedent did alone and some of it with the help of the purchaser. He climbed on and off his truck. He walked up and down the steps of terraces and porches, and at least one, and seemingly two, cellars. His helper had to remain on the truck so as to hand the goods down, the truck had been loaded so high. As decedent's foreman testified, "It was all heavy stuff." The making of the four trips required the handling of large, heavy and awkwardly shaped pieces which on one occasion had to be, with difficulty, maneuvered into a cellar. The difficulty mentioned is decribed in detail by the witness Mc-Cardle to whom the perticular goods were delivered. The witness Clements, to whom the second delivery was made, said that he and decedent made eight trips into the cellar with sheet rock and that "the job was too heavy for one man." That the work was unusually arduous and heavy is further shown by the testimony of decedent's foreman that "it was a very hard day's work, * * * unusually hard;" that "there was an accumulation of orders for sheet rock," which accounted for the extraordinary amount of such material handled that day. And the witness Bohen, one of the respondents, says that because of the "heaviness of the work" it was necessary that day to supply decedent with a helper.

But the helper was not assigned until after lunch, when decedent left the yard at one o'clock. It should be noted too that respondents in their brief expressly concede "that the work that day was extra heavy," though urging that the presence of the helper reduced decedent's work to normal. The avoidance begs the question. Plainly the difference here between a helper and no helper is the difference between the difficult and the impossible. The proofs show with picturesque clarity how the height of the five-ton load made it imperative that there be an extra man. And how much of the five tons of building material had already been lifted and carried or dragged from the truck when only the last delivery had yet to be made does not precisely appear, but it is indubitable in the circumstances that it was the greater portion by far.

Now, in the course of the five deliveries and toward the end of the day, decedent manifested, according to the proofs in petitioner's case, certain definite cardiac symptoms. Respondent denies there were antecedent symptoms, and upon the one factual issue thus resulting the ultimate outcome depends. It will be seen that the theories of the medical experts finally are not in disagreement, but that all alike, in the last analysis, are shown to be for or against the claim of causal relation, depending upon whether the positive or negative contention prevails in this matter of the symptoms.

What are the proofs? Petitioner's case shows by the testimony of Krosn, the helper on the truck, that after decedent had made the third delivery he was "all in," was sweating and blue in the face and started to breathe heavily; that at the same time he held his hand over his chest and complained of severe pain. After resting ten or fifteen minutes he said he was "all right," climbed back on the truck and drove to the place of the fourth delivery, where the aforementioned difficulty was had in getting the goods into the cellar. Upon the completion of this delivery decedent again complained of severe pain in the chest and again breathed heavily. The blueness returned to his face, and before climbing back on the truck he remained standing beside it for about five minutes, then remarking: "All right, we can go. This is the last stop we have to finish and we can go home." The

drive between the fourth and fifth deliveries was a matter of a few blocks, and during it, according to the helper, decedent's breathing was very heavy all the time. Upon arriving at the last place of delivery decedent left his truck and walked slowly up the steps to the porch. It was here, in the manner already described, that he fell and died. · It should be added that when the foreman, Slomovitz, saw decedent at about four o'clock in the afternoon the latter was "sort of poofed out. He was like gray, tired." Respecting the testimony of Krosn, respondent relies for contradiction mainly on the witnesses Rudat and McCardle, the persons by whom the goods were received at the third and fourth places of delivery and who rendered decedent some help. It was Rudat, it should be remembered, who received the goods at the third stop, where decedent is described as showing the symptoms after completing the delivery and returning to the truck, and where he stood beside the truck several minutes before driving off. Rudat's testimony, notwithstanding what he says on direct examination, is all reduced to the important admission that "whether he [decedent] stopped on the way from the garage [where the goods were placed] to his truck" he (Rudat) "did not actually know;" nor what decedent's appearance was, with reference to his face, when he arrived "at his truck." It is obvious that Rudat's testimony can be given no effect in the particular now examined, and for an additional reason presently to appear.

As to happenings at the fourth stop, the witness McCardle does not controvert the helper's testimony at all with relation to decedent's appearance and behavior after making the delivery. He did not see, and was in no position to say. He testifies: "I immediately went into the house. I did not watch him for any period of time. The man did not take more than two steps until I had gone in the door."

There are other witnesses from whom respondents elicited certain negative answers bearing on this subject, but none of these persons was shown to have been present or in a position to make the necessary observations at any of the times mentioned by Krosn and Slomovitz, nor is it contended by petitioner that the questioned phenomena were extant all the

time, nor that decedent spoke constantly of pain, but that these things happened in paroxysms and as indicated by the proofs.

Respondents rely further for contradiction on a statement made by Krosn to an officer of the Kearny police and written out by the officer a very short time after decedent had been pronounced dead. The statement contains the following: "*Q.* Had Alex complained at any time while you were with him of feeling ill? *A.* No, sir, he was his usual self all afternoon, laughing and joking and not complaining of not feeling well." What Krosn says concerning this is that "he [the policeman] didn't ask me after. He only asked me how Alex was in the beginning;" that he told the officer Alex felt all right when they started out; and that his statement to the officer of Alex's condition relates to the time "before we got to Lyndhurst." The officer says that when the statement was taken from Krosn the latter was "pretty much excited." And he describes further the general atmosphere of disturbance prevailing at the time.

It is not our judgment that under all the circumstances, in dealing with this question of credibility, a generalized statement like that claimed to have been given the police should be permitted to counter-vail the more particular details in the description specifically elicited from the witness in direct and cross-examination in a formal hearing. But aside from the failure of these attempts to contradict Krosn's testimony of antecedent symptoms, it must not be overlooked that the testimony is strengthened by its own inherent probability. The witness is telling of the last few hours of the life and work of one who toward the end of a long, laborious day dropped dead; he is telling of what, in the physical appearance and manifestations of the victim, preceded the death and while the victim was still in the course of his heavy work. Respecting the physical appearance and the manifestations described, it is implicitly postulated in the testimony of the medical witnesses on both sides that these symptoms are such as normally precede sudden death from cardiac cause. Upon an overwhelming preponderance of probability the petitioner's proofs must prevail, and thus is established in

the case, as already explained, the factual premise of the medical conclusions, which we next consider.

For the petitioner were Drs. Bernstein and White; for respondent, Dr. Kaufman. On a hypothesis which included the antecedent symptoms aforementioned, petitioner's doctors both testified that death was the result of myocardial infarction secondary to acute coronary insufficiency and that it was causally related to the arduous work done by decedent during his last day. Dr. White gave it as his further opinion that decedent had had a prior existing coronary arteriosclerosis. Petitioner's physicians expounded their theories at length and, as we judge, with credible cogency, supported in the case of Dr. White by a plenitude of autoptic experience as army surgeon in the late war. Respondents' Dr. Kaufman, on a hypothesis which excluded the antecedent symptoms (but included the alleged answer of Krosn to the police respecting the normal appearance of decedent and the absence of complaints of illness), declared at first that without an autopsy any statement of diagnosis or of causal relation could be no better than conjecture. He later receded from this position when he testified that the lapse of fifteen or twenty minutes between the delivery of the fourth load and the final collapse made it, not conjectural or impossible, but "*difficult* to say that such a coronary occlusion was related to the employment," the doctor having previously admitted that were there no such interval there would be no problem of causal relation. But the ultimate significance in the testimony of the opposing physicians attaches to the following. When required to include the antecedent symptoms in his hypothesis, Dr. Kaufman admitted that in such case the man who examined the body and signed the death certificate would have the "proper facts to assume that he died of coronary occlusion;" and at no time did Dr. Kaufman suggest that given the cause of death as coronary occlusion, there would remain any serious doubt of the relation between the death and the effort. Dr. White, on the other hand, when required to predicate his opinion upon a converse exclusion of the antecedent symptoms—notwithstanding he had previously stated this would not alter his view—and to assume also, contrary to his

opinion, the absence of underlying sclerosis, declared that the sudden death from strain "of one in perfect health" while not impossible, would not be probable. It is these mutual concessions of the doctors, based upon correlatively opposite amendments of their respective hypotheses, that make the medical pronouncements contingent in their import solely upon the presence or the absence of the antecedent symptoms. And since, for the reasons already set forth, we judge the fact of these symptoms to be evidentially established, the medical testimony is relieved of controversy and places causality beyond dispute.

The dismissal in the Bureau was based upon the following conclusions of the Deputy Commissioner:

"From the medical testimony it appears that one cannot be certain of the cause of death without a post mortem, which was not performed. However, I believe, there is sufficient evidence in this case to warrant a presumption that death was due to heart failure.

"The burden is on the petitioner to prove that there was something unusual about the decedent's employment which either caused or contributed to his death.

"After a most careful study of the entire evidence, I am unable to find any unusual circumstance that contributed to his death. There was no direct trauma. It was not proven that it was an abnormally hot day. There was no proof of a pre-existing heart disease. It was not shown that any unusual effort was expended or that the decedent was put to any excessive strain at the time of his death."

In the first place, by way of clarification let it be said, we are aware of no burden on petitioner to prove that the death was "caused or contributed to" by "an unusual circumstance" or "an excessive strain" in the work, even though such proof be present here, and we cite as authority on the point *Molnar* v. *American Smelting and Refining Co.*, 127 *N. J. L.* 118; 21 *Atl. Rep.* (*2d*) 213; *Hentz* v. *Janssen Dairy Corp.*, 122 *N. J. L.* 494; 6 *Atl. Rep.* (*2d*) 409; *Ciocca* v. *National Sugar Refining Co.*, 124 *N. J. L.* 329; 12 *Atl. Rep.* (*2d*) 130; *Bollinger* v. *Wagaraw Building Supply Co.*, 122 *N. J. L.* 512; 6 *Atl. Rep.* (*2d*) 396. Moreover, where

the workman is shown, through illness, to be affected by a predisposing incapacity for the burden of his work, that circumstance becomes no more than evidence bearing on the question of probable cause, so that "pre-existing heart disease" is certainly not a condition of recovery. The settled law of this state we understand to be that where the work is too much for the workman, sick or well, his death as a consequence is compensable. Chief Justice Case in *Molnar* v. *American Smelting and Refining Co., supra* (127 *N. J. Eq.* 118; 21 *Atl. Rep.* (2d) 214) quotes with approval from *Bollinger* v. *Wagaraw Building Supply Co., supra,* as follows: "I do not think we should attach any importance to the fact that there was no strain or exertion out of the ordinary. * * * Nor do I think we should attach any importance to the fact that this man's health was as described. * * * An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of health." It is our understanding also that whenever our higher courts have shown concern with usual or unusual conditions of the work in contemplating causal relation in a cardiac case, most recently in *Young* v. *Sheffield Farms,* 136 *N. J. L.* 489; 56 *Atl. Rep.* (2d) 868 ("unusual episode"), it has been by way of the appraisal of evidence and not the defining of a rule of recovery.

If we may be permitted to add reason to authority, we venture to suggest that the vice of the requirement in claims of this kind that the work presents some unusual circumstance or episode lies in the fact that it considers one while ignoring the other of two inseparable factors, the worker and the work. In *Hentz* v. *Janssen Dairy Corp., supra,* the Supreme Court had denied compensation. In restoring the award, the Court of Errors and Appeals said: "The Supreme Court erroneously considered the circumstance that the heart had been weakened by the strain of work over a long period of time as excluding recovery, but this is a circumstance which under our cases and those decided in England, could make no difference where the accident arose out of and in the course of the employment."

In making the present decision we are not unmindful of that of our Supreme Court in the recent case of *Young* v. *Sheffield Farms, supra.* We believe the two cases to be readily distinguishable, (a) because the present proof giving rise to fair inference of the effect on the workman of the stress and burden of the work is definitely stronger; (b) because in the present case, and apparently not in the other, the question of causality is resolved by the contingent assent of the medical witnesses in the manner shown above; (c) because, with respect to the Supreme Court's mention of "unusual episode" in the work, we cannot discern from the opinion as a whole that anything of that kind is intended to indicate a principle of recovery, more especially in view of repeated decisions to the contrary in the cases hereinabove cited and in others; and (d) because in the present case there was tacit withdrawal by the witness who advanced it of the proposition that autopsy is necessary, besides which there is certainly no reason to suppose that the Supreme Court in *Young* v. *Sheffield Farms* intended to present the paradox of requiring autoptic certitude while at the same time expressly adhering to the fundamental principle of proof by a preponderance of probabilities according to the common experience of mankind.

This court finds that petitioner's husband, Alexander Moleski, met his death on May 29th, 1947, as the result of injuries sustained in an accident arising out of and in the course of his employment.

The record contains the following stipulations: that the weekly wage was $50; that decedent left him surviving in addition to petitioner, a minor child, born September 19th, 1946, both dependent; and that the expense of the funeral was in excess of $250.

There is awarded in accordance with the foregoing the maximum compensation which the statute provides. All payments are to be made to Eleanor Moleski, petitioner, as the widow and as surviving parent of the said infant. The form of determination and judgment will be settled, and all allowances made, on notice.